

**CLERK, U.S. BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed September 27, 2017**

**United States Bankruptcy Judge**

_____

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **In re:** § | | |
| § | | |
| **ROBERT JAMES EVANS, JR. and** § | **Case No. 15-32265-hdh7** | |
| **VERNA PAULETTE EVANS,** § | | |
| § | | |
| Debtors. § | | |
| § | | |
| § | | |
| **RONNIE HAMILTON, Individually** § | | |
| **and on behalf of STARFIRE** § | | |
| **MANAGEMENT, L.L.C. and** § | | |
| **STARFIRE PROPERTIES, L.P.,** § | | |
| § | **Adv. Proc. No. 15-3111-hdh** | |
| Plaintiffs, § | | |
| § | | |
| v. § | | |
| § | | |
| **ROBERT JAMES EVANS, JR.,** § | | |
| § | | |
| Defendant. § | | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

On June 5 through 7, 2017, the Court held trial on the *First Amended Complaint to Determine Dischargeability of Debt* [Docket No. 8] (the "Complaint") filed by Ronnie Hamilton

1

individually and on behalf of Starfire Management, L.L.C. and Starfire Properties, L.P. (the "Plaintiffs"). In the Complaint, the Plaintiffs seek an order from this Court declaring a debt stemming from a state court judgment nondischargeable under 11 U.S.C. § 523(a)(4).[1]

The judgment at issue (the "State Court Judgment") was entered against Robert J. Evans, Jr. (the "Defendant"), the debtor in the above-captioned bankruptcy case, on December 4, 2014 in the state court lawsuit styled *Ronnie Hamilton, individually and on behalf of Starfire Management, LLC and Starfire Properties, LP v. Robert J. Evans, Jr.; Robert Paul Evans; Yvonne Sipple; Starfire Management, LLC; Starfire Properties, LP; Quantum Contracting, Inc.; Southwest Recycled Materials, LP, and Platinum Paving*, in the 439th District Court for Rockwall County, cause no. 1-08-104 (the "State Court Proceeding").

Following a motion for summary judgment filed by the Plaintiffs,[2] this Court entered an order holding that no genuine issue of material fact remained for the Court to resolve regarding the existence of a breach of fiduciary duty or the Defendant's liability for it.[3] The order clarified that the only remaining issue for resolution in this proceeding is whether the Defendant's breach of fiduciary duty was an act of defalcation under 11 U.S.C. § 523(a)(4).

The following are the Court's Findings of Fact and Conclusions of Law.[4] Based on these Findings of Fact and Conclusions of Law, the Court determined that the Plaintiffs have not met

---

[1] The Court has considered the Complaint, the First Amended Answer filed by the Defendant [Docket No. 22], the Plaintiffs' Proposed Findings of Fact and Conclusions of Law [Docket No. 56], the Defendant's Proposed Findings of Fact and Conclusions of Law [Docket No. 58], the Joint Pretrial Order [Docket No. 65], the Plaintiffs' Post-Trial Brief [Docket No. 100], the Plaintiffs' Post-Trial Proposed Findings of Fact and Conclusions of Law [Docket No. 101], and the Defendant's Post Trial Brief [Docket No. 102].

[2] Docket No. 32.

[3] Docket No. 46.

[4] The following are the Court's Findings of Fact and Conclusions of Law, issued pursuant to Rule 52 of the Federal Rules of Civil Procedure, as made applicable in adversary proceedings, pursuant to Federal Rule of Bankruptcy Procedure 7052. Any Finding of Fact that more properly should be construed as a Conclusion of Law shall be considered as such, and *vice versa*.

their burden of showing that the Defendant's actions meet the standard for defalcation under 11 U.S.C. § 523(a)(4).

## I.     JURISDICTION AND VENUE

This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 151 and 1334, as well as the standing order of reference in this district.  This adversary proceeding involves a core matter under 28 U.S.C. § 157(b)(2)(A) and (I), as the adversary proceeding involves a determination as to the dischargeability of a particular debt.  Venue for this adversary proceeding is proper pursuant to 28 U.S.C. § 1409(a).

## II.    FINDINGS OF FACT

**A.    Background Information**

The dispute between the Plaintiffs and the Defendant (jointly, the "Parties") stems from a business relationship.  In 1996, Plaintiff Ronnie Hamilton and the Defendant created a paving company called Quantum Contracting, Inc. ("Quantum").  Mr. Hamilton and the Defendant each owned fifty percent of Quantum.  Mr. Hamilton was the president of Quantum.  The Defendant was the vice president of Quantum.

The Defendant contributed land to the business (the "Springer Road Property") and Mr. Hamilton contributed a warehouse.  The warehouse was erected on the land by Quantum without compensation.  Later, Quantum built another larger warehouse on the Springer Road Property along with some other improvements for which Quantum was not paid.

The Parties created Starfire Management, LLC ("SF Management") and Starfire Properties, LP ("SF Properties") in 2001, and Southwest Recycled Materials, LP ("SRM") in 2004 (collectively, with Quantum, the "Companies").  SF Management was the management company for SF Properties and SRM.  SF Properties had no bank accounts or assets, except that it owned

the Springer Road Property. SF Management owned one percent of each of SF Properties and SRM, as general partner, with Mr. Hamilton and the Defendant owning the remaining percentages in equal amounts. SRM was created most recently, and was a concrete crushing company. Both the Defendant and Mr. Hamilton were managing members of all of the Companies until late 2005.

The Defendant was responsible for the day-to-day operations of each of the Companies. Mr. Hamilton was a self-proclaimed "absentee owner" of the Companies until early 2005, when he became actively involved in SRM. The Parties operated in an informal manner and did not hold formal meetings. Neither Mr. Hamilton nor the Defendant required formal company meetings or resolutions prior to obtaining loans or repaying obligations. Mr. Hamilton and the Defendant often transferred money between the Companies—and among the Companies and their personal accounts—without providing promissory notes or other written documentation of the transfers, outside of notes on the Companies' books.

Originally, a certified public accountant who worked for Mr. Hamilton, May Cates, was in charge of the books and records for Quantum. Starting in 2001, the Defendant's sister, Yvonne Sipple, helped the Parties and Ms. Cates with the books, records, and accounting for each of the Companies that were in existence at the time. Approval for taking actions on the Companies' books was not required; Mr. Hamilton and the Defendant deferred to Ms. Cates and Ms. Sipple's judgment. Testimony at trial from both Mr. Hamilton and the Defendant indicated that neither of them were active in ensuring the correctness of the Companies' books and records, and instead, relied on Ms. Cates and Ms. Sipple for their accuracy.

In 2003, Ms. Cates stopped working with the Parties, leaving Ms. Sipple fully in charge of the books, records, and general accounting for the Companies. Ms. Sipple was not a licensed certified public accountant in the state of Texas, but was a licensed certified public accountant in

Arizona. Ms. Sipple often took unilateral actions with regard to the Companies' books and records. Ms. Sipple testified that she was extremely busy handling the books for all four Companies and would often work into the night. She also testified that she often reclassified items on the Companies' books at the end of the year to correct items that were entered incorrectly. Ms. Sipple would place items she was uncertain about into due/from accounts or capital accounts until she had more information.

After many years, the relationship between Mr. Hamilton and the Defendant eventually deteriorated, and they entered into a separation agreement on November 28, 2005 (the "Separation Agreement"). Pursuant to the terms of the Separation Agreement, Mr. Hamilton transferred his 50% interest in Quantum and his 49.5% interest in SRM to the Defendant in exchange for certain equipment owned by Quantum and SRM.

**B.     The Comerica Bank Transfers**

There are two batches of transfers at issue in this proceeding. First, in 2003, SF Properties obtained a loan from Comerica Bank in the amount of $250,000 (the "Comerica Loan").[5] A little over $50,000 of the Comerica Loan was used for improvements to the Springer Road Property. Amounts from the Comerica Loan were also transferred to Quantum as follows:

1. On May 23, 2003, $100,000 was transferred to Quantum. The total amount of this transfer was accounted for in a promissory note, dated May 23, 2003, for the benefit of SF Properties.

2. On June 3, 2003, $25,000 was transferred to Quantum. The total amount of this transfer was accounted for in a promissory note, dated June 3, 2003, for the benefit of SF Properties. The memo line in Quantum's books lists the transfer as a "loan."

3. On July 2, 2003, $50,000 was transferred to Quantum. Half of the amount of this transfer was accounted for in a promissory note, dated July 2, 2003, for the benefit

---

[5] All money received by SF Properties went immediately to SF Management's bank accounts, as SF Properties did not have a bank account. There is no evidence of written documentation of transfers from SF Properties to SF Management.

      of SF Properties. The memo line in Quantum's books lists the transfer as a "loan from Starfire."

(the "<u>Comerica Transfers</u>").  Additional amounts were also transferred to Quantum from SF Properties after disbursement of the Comerica Loan, which may or may not consist of funds received through the Comerica Loan.  There is no evidence that promissory notes were created for these additional transfers.  Some of the amounts were repaid in part, but the Comerica Transfers were not repaid in full.

  Mr. Hamilton never made a written demand to the Defendant or Quantum for repayment of the Comerica Transfers.  Neither the Comerica Loan nor the Comerica Transfers were mentioned in the Separation Agreement.

  At the end of 2005, the Comerica Transfers were reclassified in Quantum's books from amounts due to SF Management to an investment in Quantum.  Ms. Sipple unilaterally made this reclassification, without the knowledge or authorization of Mr. Hamilton or the Defendant, believing that the Comerica Transfers did not need to be repaid.

  Ms. Sipple and the Defendant testified at trial that they believed the money had been given to Quantum as payment for the improvements Quantum had made on the Springer Road Property, including the erection of the two warehouses.  The Defendant further testified that the Comerica Transfers were meant to recapitalize Quantum to protect its bonding credit.  The Defendant testified that he signed the promissory notes for the Comerica Transfers because he was relying on Ms. Cates' judgment, even though he did not know why the notes were written.

**C.**   **The Lehman Brothers Transfers**

  The second batch of transfers stem from another loan.  On January 24, 2005, SF Properties obtained a loan from Lehman Brothers in the amount of $679,000 (the "<u>Lehman Loan</u>").  The stated purpose of the loan was to refinance the Comerica Loan and to pay off a piece of equipment

6

in an amount of $53,000. The amount of cash left over, $385,210, was disbursed to SF Properties on January 27, 2005. A portion of that cash was transferred to SRM as needed, to fund operations (the "Lehman Transfers"). None of these transfers were repaid.

Mr. Hamilton never made a written demand to the Defendant or SRM for repayment of the Lehman Transfers. Neither the Lehman Loan nor the Lehman Transfers were mentioned in the Separation Agreement.

At the end of 2005, the Lehman Transfers were reclassified in SRM's books from amounts due to SF Management to an investment in SRM. Ms. Sipple unilaterally made this reclassification, without the knowledge or authorization of Mr. Hamilton or the Defendant, believing that the Lehman Transfers did not need to be repaid. Ms. Sipple and the Defendant testified at trial that they believed the Lehman Transfers were capital investments in SRM that were never meant to be repaid.

**D.    The State Court Judgment**

Two years later, in 2007, the Plaintiffs brought suit against the Defendant, Ms. Sipple, and other parties, alleging that, *inter alia,* the Defendant breached his fiduciary duties to Mr. Hamilton and SF Properties by cancelling debts owed to them from the Comerica Transfers and Lehman Transfers. The State Court Judgment contained the following findings and conclusions:

   a.   that Quantum owed a debt to Plaintiff Starfire Properties of $193,957.25;
   b.   that Defendant breached his fiduciary duties owed to Starfire Properties, L.P. regarding the purported cancellation of this debt;
   c.   that prejudgment interest on the claim of $193,957.25 was $75,044.04 for a total judgment on this claim in favor of Starfire Properties of $269,001.79 plus attorneys' fees;
   d.   that SRM owed a debt to Starfire Properties of $340,389.00;
   e.   that Defendant breached his fiduciary duties owed to Starfire Properties regarding the purported cancellation of that debt of $340,389.00; and

      f.      that prejudgment interest on the claim of $340,389.00 was $133,993.01 for a total judgment in favor of Starfire Properties of $474,382.01 plus attorneys' fees.

In the State Court Judgment, attorneys' fees in the amount of $175,000.00 were awarded to Mr. Hamilton on behalf of the Starfire Properties and Starfire Management. Mr. Hamilton was also awarded the sum of $263,391.78 representing the principal amount of the notes assigned by Jack Stilwell and Michael Hamilton to Mr. Hamilton and owed by SRM in the amount of $150,000.00 plus prejudgment interest in the amount of $113,391.18. Mr. Hamilton was also awarded the sum of $120,004.63 representing the $89,780.00 owed by SRM to Mr. Hamilton plus prejudgment interest in the amount of $34,224.63.

No appeal of the State Court Judgment was taken by the Defendant and the State Court Judgment is now final under Texas law.

The Defendant filed for protection under chapter 7 of the Bankruptcy Code on May 30, 2015. This adversary proceeding was commenced on September 8, 2015.

**E.**      **Credibility of Witnesses**

The Court would like to make a few observations about the credibility of the various witnesses who offered testimony at trial.

Mr. Hamilton was a credible witness, recounting facts regarding events from long ago to the best of his ability. His recollections were not always perfect, but he appeared to be trying to honestly recall what he could while admitting when he could not recall certain details.

The Defendant also appeared to recount facts regarding events from long ago to the best of his ability. In general though, the Defendant's recollection seemed to be less clear and generally slightly less reliable than Mr. Hamilton's.

Paul Evans had very little direct knowledge about anything relevant to the issues remaining for trial. His testimony was not helpful.

Ms. Sipple appears to have been overworked during the relevant time period. She was credible with regard to general statements about the Companies' accounting practices but was unreliable as to particular details. Some aspects of her testimony were inconsistent with documents entered into evidence.

Elizabeth Schrupp testified as an expert witness for the Plaintiff. While undoubtedly qualified with respect to forensic accounting, Ms. Schrupp appeared biased against the Defendant, as displayed by her testimony, tone, demeanor, and behavior throughout trial (including when she was communicating with the Plaintiffs' counsel while others were testifying), which affects this Court's view of her credibility. It was also pointed out that Ms. Schrupp simply accepted Mr. Hamilton's representations regarding his state of mind as true and never spoke with the Defendant or Paul Evans. Ms. Schrupp also apparently only met with Ms. Sipple once and did not ask her for clarifications or explanations regarding actions Ms. Sipple took. Ultimately, Ms. Schrupp's opinions included very sweeping and confident conclusions about the intent of individuals, and the Court did not see a sufficient basis for forming these opinions. Thus, this Court did not give Ms. Schrupp's testimony much weight in coming to its conclusions.

### III. CONCLUSIONS OF LAW

Section 523(a)(4) of the Bankruptcy Code excepts from discharge debts "for fraud or defalcation while acting in a fiduciary capacity . . . ." The Plaintiffs must prove by a preponderance of the evidence that the debts awarded in the State Court Judgment are nondischargeable. *See Grogan v. Garner*, 498 U.S. 279, 286 (1991). The dischargeability of the debt should be construed liberally in favor of the Defendant/Debtor. *See Hudson v. Raggio & Raggio, Inc. (In re Hudson)*, 107 F.3d 355, 356 (5th Cir. 1997).

The Supreme Court of the United States recently clarified the meaning of "defalcation" under section 523(a) in *Bullock v. BankChampaign, N.A.*, 569 U.S. 267 (2013). The Supreme Court explained that defalcation "includes a culpable state of mind requirement." *Id.* at 269. More specifically, though, even if the actor does not commit a knowingly improper act, defalcation includes a conscious disregard or willful blindness to "a substantial and unjustifiable risk" that the actor's conduct will breach his fiduciary duties. *Id.* at 274. The risk involved "must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him, its disregard involves *a gross deviation* from the standard of conduct that a law-abiding person would observe in the actor's situation." *Id.* (emphasis in original) (citing ALI, Model Penal Code § 2.02(2)(c), p. 226 (1985)).

The Companies were clearly operated in a fairly informal manner, and corporate formalities were not observed. It seems to have been the course of conduct between the Parties that many transactions were not specifically discussed by Mr. Hamilton and the Defendant and Ms. Sipple was not always given complete information on how to record transactions in the Companies' books and records. These types of situations where not all transactions are properly and contemporaneously documented lend themselves to misunderstandings. Parties or their accountants are often forced to try to recall the purpose and intent of a given transaction, and this presents fertile ground for mistaken recollections. Nevertheless, the accounting reclassifications were improper.

The question before the Court, however, is whether the Defendant had a culpable state of mind in connection with those reclassifications. After considering the evidence presented at trial, particularly regarding the Parties' regular course of conduct, the Court does not believe a culpable state of mind has been shown. Most of the evidence focused on why Ms. Sipple handled the

accounting the way that she did, and there has not been a sufficient showing to find that the Defendant intentionally or knowingly committed an improper act. There also has not been a sufficient showing to find that the Defendant exhibited conscious disregard or willful blindness to a substantial and unjustifiable risk that the Defendant's actions would breach his fiduciary duty. As a result, the Plaintiff has not met his burden of proof to show that the Defendant's breach of fiduciary duty was an act of defalcation under section 523(a)(4).

Counsel for the Defendant should submit a form judgment to the Court within fourteen days of the entry of these Findings and Conclusions.

### End of Findings of Fact and Conclusions of Law ###